# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

SCOTT M. THORPE,

                              Plaintiff,

          -v.-                                   5: 13-CV-902
                                                (GTS/ATB)

THE VILLAGE OF GREENWICH, et al.,

                             Defendants.

SCOTT M. THORPE, Plaintiff pro se

ANDREW T. BAXTER, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

The Clerk has sent to the court for review a complaint, together with an application to proceed in forma pauperis ("IFP"), submitted for filing by plaintiff Scott M. Thorpe. (Dkt. Nos. 1, 2). In this civil rights complaint, plaintiff alleges that defendants have defamed him, deprived him of due process, and subjected him to "cruel and unusual punishment" while he was a pretrial detainee at the Washington County Correctional Facility ("WCCF").[1] (Compl.) (Dkt. No. 1).

## I.   <u>IFP Application</u>

A review of plaintiff's IFP application shows that he declares he is unable to pay the filing fee. (Dkt. No. 2). This court agrees, and finds that plaintiff is financially eligible for IFP status.

In addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss

---

[1] Plaintiff also refers to this as the Washington County Jail. The court will use "WCCF" for all references to the facility.

the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i) -(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward *pro se* litigants, and must use extreme caution in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First East Seventh St. Tenants Corp*., 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint *sua sponte* even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp*., 550 U.S. at 555). The court will now turn to a consideration of the

2

plaintiff's complaint under the above standards.

## II.  **Complaint**

### A.    **Facts Associated with "Count I"**

Plaintiff names three sets of defendants, which he has separated into three "counts" of the complaint. (Compl. at 1).  Plaintiff claims that on April 13, 2010, he was building a log home for himself on his mother's[2] property, when Mike Renway ("Renway")  contacted the Washington County Sheriff's department and accused plaintiff of assaulting him. (Count 1 ¶ 1).[3]  Apparently, at the same time, Renway also mentioned that plaintiff was in possession of a picture of a deceased male, who Renway believed was a missing child or young man named Jaliek Rainwalker ("Rainwalker").  Plaintiff states that Rainwalker had been listed as a "missing person" since November, 2007. (*Id.*)

On April 14, 2010, sheriffs from Washington County executed search warrants on plaintiff's and Allen's property. (Count 1 ¶ 2).  The search warrants authorized the law enforcement officers to retrieve any items that may have been related to the Rainwalker disappearance. (*Id.*)  Plaintiff denied that he had any involvement in the child's disappearance, and Allen, who was a police officer for twenty years, determined "[a]fter investigating these allegations further, . . . that [plaintiff] was incarcerated for a work release violation" at the time of the child's disappearance and thus, could not have been responsible. (Count 1 ¶ 3).  Plaintiff alleges that, at the end

---

[2] Plaintiff's mother's name is Sheryl Allen ("Allen").

[3] Each "Count" of the complaint has separate numbered paragraphs, starting with "1."  Thus, the court will cite to the complaint by the "Count" and the corresponding paragraph number.

of April, 2010, Allen met with Washington County Undersheriff, Matt Mabb ("Mabb") to show him the "printout" of plaintiff's conviction sheet, which showed him to be incarcerated at the time of Rainwalker's disappearance. (Count 1 ¶ 4). Plaintiff states that Mabb agreed that plaintiff could not have been involved. (*Id.*)

Notwithstanding this proof that plaintiff could not have been responsible for the child's disappearance, plaintiff alleges that, on August 10, 2010, "the media" ran a story stating that plaintiff was "a suspect" in the Rainwalker disappearance. Plaintiff claims that the "false and inaccurate" information was provided to the "media" by defendant George Bell, the Cambridge/Greenwich Chief of Police. Plaintiff claims that this false information originated with Renway's statements about plaintiff to the authorities, and that "this was obviously a false accusation that Mr. Renway made to the police." (Count 1 ¶¶ 5, 5(A)).

Plaintiff states that defendant Bell also told the "media" that the police had obtained pictures from plaintiff's property of a "deceased Brazilian man" that plaintiff had downloaded from the "Faces of Death" website. (Count 1 ¶ 5(B)). Plaintiff states that the police "claimed" that the individual in the photographs resembled Rainwalker.[4] Plaintiff claims that defendant Bell recklessly disregarded the truth when he made his statements to the police that led to the August 10, 2010 article. Plaintiff also claims that defendant Bell told the "media" that plaintiff lived in

---

[4] Plaintiff states that, at some point, the photographs were sent to forensic specialists who determined that they were not pictures of Rainwalker. Clearly, this was not part of the information that defendant Bell allegedly leaked to the media even though the plaintiff begins the paragraph stating that the following were "pieces of information that Mr. Bell released to the media," trying to tie plaintiff to "this heinous crime." (Count 1 ¶ 5, 5(B)).

Greenwich at the time of the disappearance, but that was false because plaintiff was incarcerated at the time. Plaintiff states that this was "proved" to Mabb at the end of April, 2010. Plaintiff claims that Bell was reckless[5] in releasing this defamatory information to the media in August of 2010, when he could have discovered the truth with a proper investigation of the facts. (Count 1 ¶ 5(D)). Plaintiff states that the information provided by defendant Bell appeared in newspapers, and was broadcast by various radio, and television stations. (Count 1 ¶ 6). Plaintiff speculates that the coverage could have "reached the national level" because Rainwalker's name was on the national list of "Missing and Exploited Children."[6] (Count 1 ¶ 7).

## B.    Facts Associated with "Count II"

Plaintiff alleges that on April, 14, 2010,[7] he "left" New York State. (Count 2 ¶ 1). Plaintiff was arrested in Fort Lauderdale, Florida on July 1, 2010, based upon an "outstanding felony warrant, issued out of New York State," stemming from the "alleged attack" on Renway. (*Id.*) Plaintiff was extradited to New York on July 28, 2010 and placed in custody in a "disciplinary keeplock/segregation" unit of the WCCF. (Count 2 ¶ 2). Plaintiff alleges that he was placed in this unit for 167 days without a hearing and placed on "suicide watch, on several occasions," without justification. (*Id.*)

---

[5] Plaintiff states that defendant Bell was acting "in malice for his recklessness for the truth. . . ." (Count 1 ¶ 5(D)).

[6] Plaintiff states that he does not have the resources to investigate the "complete extent" of the media coverage. (Count 1 ¶ 7).

[7] This happens to be the same date that plaintiff states the search warrants were executed.

Plaintiff claims that during the time that he was "unlawfully" detained in the special housing unit, he was subjected to cruel and unusual punishment. (Count 2 ¶ 3). This cruel and unusual punishment consisted of restricting his showers, limiting his telephone calls, preventing his communication with the general population at WCCF, and denying him access to television and newspapers. (*Id.*) Plaintiff also claims that when he left his cell for "Bible study classes, lawyer visits, and family visits," he was transported in handcuffs and shackles "then led to his awaiting visitors." (*Id.*) Plaintiff states that an inmate "detained under these circumstances," must be given a hearing every two weeks to review his status, and argues that even when those hearings are "legally" held, an inmate may not be held longer than 120 days in this type of confinement. (Count 2 ¶ 4).

## C.    Facts Associated with Count III

Plaintiff states that he was convicted in January 2011 of charges "related to the alleged attack on Mr. Renway." (Count 3 ¶ 1). Plaintiff's co-defendant, Williams Dingman ("Dingman") testified against him at trial in exchange for a favorable plea bargain. (*Id.*) Plaintiff states that, on January 28, 2011, at Dingman's sentencing, his attorney, Public Defender Christian Morris ("Morris") and Washington County District Attorney, Keven Kortright ("Kortright") made "false and misleading" accusations against the plaintiff. (Count III ¶¶ 2,3). These statements related to an alleged plot by plaintiff to poison Dingman. (*Id.* ¶ 3). Plaintiff claims in this paragraph, that these statements were made in an attempt to "get Judge McKeighan to depart even further on [sic] Mr. Dingman's time cut." (*Id.*)

Plaintiff alleges that defendant Don Lehman ("Lehman"), a reporter for the Post Star, a Glens Falls newspaper, was present in the courtroom when the defamatory statements against plaintiff were made. (Count III ¶¶ 2, 3). Plaintiff claims that Lehman contacted defendant Investigator Bruce Hamilton ("Hamilton"), who allegedly told Lehman that there was "a little something to [the allegations against plaintiff], but not enough to charge [him]." (Count III ¶ 4). Lehman allegedly wrote an article for the Post Star regarding these statements, which was published on January 28, 2011, but neither plaintiff, nor his attorney were aware of these allegations until Allen read the article in the morning newspaper.[8] (*Id.*) Plaintiff claims that the "defendants" were creating "propaganda in order to defame and slander the plaintiff's character further." (Count III ¶ 5).

### D. "Injuries"

#### 1. Defendants Associated with Count I

The complaint contains a section labeled "Injuries," and plaintiff lists his injuries under each of the three "Counts," associated with the individual defendant against whom he is making a claim, including the defendant municipalities. Plaintiff claims that defendant Bell defamed him when he disregarded the truth and released defamatory information to the media. Plaintiff alleges that these statements were made in bad faith, without properly investigating the truth. Plaintiff claims that he has suffered severe humiliation, mental anguish, emotional distress, and an "anxiety

---

[8] Plaintiff seems to allege that everything happened on the same day: the sentencing, the information exchange; and Allen seeing the article in the newspaper. It seems impossible that everything happened on the same day, but the court is merely relating the allegations as stated in the complaint for purposes of this Order and Report-Recommendation.

disorder," requiring medication to manage. (Injuries, Count I ¶ 1). Plaintiff names defendant Bell as the individual responsible for releasing the information, but seeks to hold the Villages of Cambridge and Greenwich as municipalities that are responsible for defendant Bell's conduct. (Injuries, Count I ¶¶ 1, 2, 4, 5). Plaintiff also seeks to hold the "Cambridge/Greenwich Police Department" as responsible for defendant Bell's alleged violations of plaintiff's rights. (Injuries, Count I ¶ 3).

### 2. Defendants Associated with Count II

The second count involves plaintiff's claims of cruel and unusual punishment and lack of due process.[9] Plaintiff seeks to hold Washington County responsible as the municipality operating the WCCF. (Injuries, Count II ¶ 1). Plaintiff also names the WCCF itself and the Washington County Sheriff's Department as defendants in this Count. (Injuries, Count II ¶¶ 2, 3). Finally, plaintiff seeks to hold Washington County Sheriff Roger Leclaire responsible for the conditions and procedures at WCCF. (Injuries, Count II ¶ 4).

### 3. Defendants Associated with Count III

Plaintiff seeks to hold the Post Star newspaper liable for the "slanderous, false and misleading" statements published in Lehman's newspaper article. (Injuries, Count III ¶ 1). Plaintiff names Lehman in his individual capacity as a reporter. (Injuries, Count III ¶ 2). Plaintiff alleges that Lehman acted with "malice and reckless disregard" when he published his article. (*Id.*) Plaintiff also seeks to hold District Attorney of Washington County, Kevin Kortright and Washington County Public

---

[9] Plaintiff also alleges that these defendants completely disregarded New York State laws governing segregated confinement. (Injuries, Count II ¶ 4).

Defender, Christian Morris liable for making false and defamatory statements about plaintiff during Dingman's sentencing. (Injuries, Count III ¶¶ 3, 4). Plaintiff also seeks to hold Washington County Investigator Bruce Hamilton liable for releasing false and defamatory statements. (Injuries, Count III ¶ 5).

Plaintiff seeks injunctive relief and a substantial amount of monetary damages. (Relief, Counts I-III).

## III. Municipalities

### A. Legal Standards

In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Id.* at 694. To establish municipal liability, the policy must actually cause the violation of constitutional rights, and it must be the moving force behind the violation. *Id.*; *Dominguez v. Beame*, 603 F.2d 337, 341 (2d Cir. 1979). The plaintiff must allege facts demonstrating

> (1) the existence of an officially adopted policy, custom, or practice and (2) a direct and deliberate causal connection between that 'policy, custom, or practice' and the violation of plaintiff's federally protected rights.

*Best v. City of New York*, No. 11 Civ. 4475, 2012 WL 5458054, at *3 (S.D.N.Y. Nov. 2, 2012) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403-404 (1997)).

A municipality may not be held liable on a "respondeat superior" theory.

*Monell*, 436 U.S. at 691.  However, a policy, custom or practice of an entity may be inferred where the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction. *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (quoting *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996)).  However, a single incident of illegality does not ordinarily rise to the level of a custom or policy. *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 440 (S.D.N.Y. 2013) (citations omitted).  An exception occurs when the action is taken by an individual who has "final policy making authority" such as the Chief of Police. *Id.*

## B.    Application

Plaintiff names the Villages of Cambridge and Greenwich as well as Washington County as defendants.  However, plaintiff essentially states that these municipalities are responsible because they "oversee" the individuals who allegedly made the defamatory statements or did not engage in a proper investigation prior to the statements.  Plaintiff does allege that one of the individuals who made the statements to the media was the Chief of the Greenwich/Cambridge Police Department.  As the chief of police may be considered a policy maker, the court will not recommend dismissal of the complaint as against the villages based on a failure to properly allege municipal liability.  Plaintiff also names Washington County Sheriff Leclaire as being personally responsible for the conditions and the procedures at WCCF, thus arguably plaintiff could state a claim against Washington County on that basis (personal responsibility of a policy-making individual).  Instead, the court will

recommend dismissing the claims on their merits as discussed below.

In addition to the municipalities themselves, plaintiff names the both the Cambridge/Greenwich Police *Department* and the Washington County Sheriff's *Department*. Plaintiff may not maintain any action against either of these police departments. Police departments are merely "administrative arms" of the municipality and do not have legal identities separate and apart from the municipality itself. *Daly v. Ragona*, No. 11-CV-3836, 2013 WL 348185, at *10 (E.D.N.Y. July 9, 2013) (citing *inter alia David v. Linbrook Police Dep't*, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002) (citations omitted); *Pooler v. Hempstead Police Dep't*, 897 F. Supp. 2d 12, 16 n.5 (E.D.N.Y. 2012) (citing cases). The same is true for jails or correctional facilities. *Icangelo v. Suffolk County Jail*, No. 12-CV-5505, 2013 WL 357601, at *2-3 (E.D.N.Y. Jan. 28, 2013) (citing *Carthew v. County of Suffolk*, 709 F. Supp. 2d 188, 195 (E.D.N.Y. 2010)).

Therefore, the police departments and the WCCF may not be sued, no matter what the theory of liability might be, and plaintiff's complaint may be dismissed with prejudice as against the three entities.

## IV. **Defamation**

### A. **Legal Standards**

Generally, defamation is an issue of state law that does not implicate federal constitutional law. *Swinton v. City of New York*, 785 F. Supp. 2d 3, 15 (E.D.N.Y. 2011) (citing *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010)). However, a plaintiff may state a "stigma plus" claim under section 1983 by alleging (1) the utterance of a

statement sufficiently derogatory to injure his reputation, that he claims is false and is capable of being proved false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights. *Id.* (citing *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004)). The deleterious effects flowing from a damaged reputation, including the impact that the defamation may have on "'job prospects, romantic aspirations, friendships, [or] self-esteem' are normally insufficient . . . ." *Sacco v. Pataki*, 114 F. Supp. 2d 264, 270 (S.D.N.Y. 2000) (quoting *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994)).

## B.    Application

Plaintiff's central causes of action are that defendant Sheriff Bell, the attorneys at his co-defendant's sentencing, investigator Hamilton, reporter Lehman, and the Post Star newspaper defamed plaintiff in various ways, including falsely implicating him in Rainwalker's disappearance and implying that plaintiff had plotted to poison his co-defendant, Dingman. Plaintiff alleges that he has suffered "humiliation, anguish, emotional distress, and . . . an anxiety disorder,"[10] that have been caused by the alleged defamation. All of these injuries are only the "deleterious effect" flowing from a damaged reputation, which as stated above is insufficient to state a federal claim. In addition, plaintiff states that he fears for his safety because of the implication regarding Rainwalker, an African American child. (*Id.*)

Plaintiff does not allege that he was innocent of the crime for which he was convicted, and he was never charged with an attempt to poison his co-defendant. The

---

[10] Plaintiff repeats these injuries several times, but they are listed *inter alia* at Count I, ¶¶ 1-3.

state-imposed alteration of plaintiff's status was a valid conviction that had nothing to do with the alleged false statements, a conviction that plaintiff does not contest in the complaint.[11]  Plaintiff states that he fears "retaliation against his life and safety due to these false accusation[s] against an African American child."  This vague allegation is insufficient to rise to the level of the "stigma plus" required to state a defamation claim under section 1983.  He does not indicate how anyone would be aware of the article that somehow briefly implicated him in the disappearance of this child.  He was not convicted of any crime even involving a child.  Plaintiff was convicted of conduct relating to the Renway assault.

In any event, according to plaintiff, it was Renway who claimed that plaintiff was involved in the Rainwalker disappearance, and the police were acting on that accusation.  Plaintiff alleges that the article stated that plaintiff was a "suspect" in that disappearance, not that plaintiff was guilty of any related crime.  The fact that the information from Renway ultimately was determined to be unfounded, does not change the fact that plaintiff was, in truth, a "suspect" in the disappearance, or that photographs resembling the lost child were found in his apartment.  Plaintiff was never charged with anything relating to the Rainwalker disappearance.

In *Swinton*, the plaintiffs claimed that at a press conference, they were portrayed as being guilty of crimes "more serious than those they committed." 785 F. Supp.2d at 15.  The court found that because they did not allege that the conduct underlying their

---

[11] Plaintiff could not contest the conviction for which he is incarcerated in this civil rights case, without a finding of its invalidity, either by a state court or a federal court after exhaustion of state court remedies and a petition for habeas corpus pursuant to 28 U.S.C. § 2254. *Heck v. Humphrey*, 512 U.S. 477 (1994)

convictions did not occur, they did not establish the threshold requirement for a stigma plus claim. By contrast, the Second Circuit has held that a plaintiff stated a stigma plus claim when her name was published in a Central Register of individuals accused of child abuse or neglect, after the charges had been dismissed. *Valmonte v. Bane*, *supra*. The court held that Valmonte's inclusion on the list potentially damaged her reputation by branding her as a child abuser, calling into question her good name, reputation, honor, and integrity. *Id.* at 1000. Because the list in question was distributed to state agencies and certain prospective employers, the presence of her name on the list would damage her ability to obtain future employment. *Id.* Thus, the dissemination satisfied the "stigma" requirement as well as the "plus" requirement because her inclusion on the list was a "specific deprivation of her opportunity to seek employment caused by a statutory impediment established by the state. *Id.*

In this case, plaintiff can make no such stigma plus showing. Plaintiff in this case was convicted of another crime, and he *was* a suspect in the Rainwalker disappearance, if only for a short time. He cannot show that defendant Bell's statements were actually false,[12] or that they damaged his reputation. Thus, plaintiff cannot assert a defamation claim under section 1983 against any of the defendants regarding the statements made about plaintiff regarding the Rainwalker investigation,

---

[12] Plaintiff claims that defendant Bell told the media that plaintiff was a "suspect," not that plaintiff was guilty of the child's disappearance. Bell is from the Village of Cambridge/Greenwich. Plaintiff concedes that for a short time, he **was** a suspect in the disappearance because Renway accused him of being involved. Thus, Bell's statement, although made after plaintiff's mother met with Mabb, who was from Washington County, was not false. The court would point out that even if the court were considering a state law defamation claim, the defamatory statement must be "false" in order to sustain the action. *See Ello v. Singh*, 531 F. Supp. 2d 552, 575 (S.D.N.Y. 2007) (citation omitted).

even assuming everything that plaintiff claims in the complaint is true.

The court would also note that if plaintiff is attempting to assert that the defendants should have made a better attempt at investigating the truth of Renway's allegations or that Bell should have been aware that plaintiff had been cleared of the allegation three months earlier, plaintiff has no constitutional right to any kind of an investigation by government officials. *Bernstein v. New York*, 591 F. Supp. 2d 448, 460 (S.D.N.Y. 2008). No court has recognized such a right, unless there was another recognized constitutional right involved. *Colquhoun v. Baugher*, 2013 WL 1736654, at *2 (W.D.N.Y. April 19, 2013) (citing *Gomez v. Whitney*, 757 F.2d 1005, 1006 (9th Cir. 1985)). *See also Segal v. New York*, 459 F.3d 207, 219 (2d Cir. 2006) (there is no separate cause of action against the municipality for the failure by the government to train its employees, leading to an inadequate investigation).

To the extent that plaintiff alleges in Count III some sort of defamation arising from any statements made during Dingman's sentencing, these claims may also be dismissed. Plaintiff claims that during Dingman's sentencing, the district attorney[13] and Dingman's defense counsel made some statements indicating that plaintiff was

---

[13] The court also notes that a district attorney's in the course of prosecuting a case are entitled to absolute immunity. *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (prosecutorial immunity covers virtually all acts associated with the prosecutor's function, including conspiracies to present false evidence); *Bernard v. County of Suffolk*, 356 F.3d 495 (2d Cir. 2004) (absolute immunity shields prosecutors from suit pursuant to section 1983 for their alleged malicious or selective prosecution as well as for any misconduct in the presentation of evidence to the Grand Jury). The court notes that statements to the media by prosecutors are only protected by qualified immunity. *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 733 (S.D.N.Y. 2012) (citing *Flagler v. Trainor*, 663 F.3d 543, 549 (2d Cir. 2011)). However, plaintiff does not allege that the prosecutor made statements to the media. The prosecutor in this case was allegedly making a statement in court, relating to a different prosecution, but in the course of that prosecution or sentencing. Thus, the prosecutor would be entitled to absolute immunity for his statements during Mr. Dingman's sentencing.

involved in a plot to poison Dingman.  However, plaintiff claims that Investigator Hamilton told Reporter Lehman that there was "a little something" to the allegations, but not enough to charge plaintiff.  There is nothing to show that this statement, more than plaintiff's actual conviction for the assault, would have "tarnished" plaintiff's reputation or that there is any showing of the "plus" required by the standard.

This claim is closely analogous to *Swinton*, *supra*.  The fact that plaintiff was portrayed as having committed a more serious crime that the one he actually committed, is insufficient to meet the defamation standard for section 1983 cases.  Thus, any claims relating to the statements made at the Dingman sentencing, or the publication of that information, may be dismissed as against all defendants in Count III.

V.    **Color of State Law**

A.    **Legal Standards**

In order to state a claim under section 1983, plaintiff must establish that he was deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed "under color of state law." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).  The law does not reach private conduct, no matter how "discriminatory or wrongful." *Id.* (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)).

An exception to the above rule occurs if the private individual conspires with a state actor to commit an unconstitutional act, or when he is a willful participant in joint activity with the State or its agents. *Ciambriello v. County of Nassau*, 292 F.3d

307, 324 (2d Cir. 2002) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)). Conclusory allegations of conspiracy, however, are insufficient to state a claim. *Id.* (citing *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)).

## B.    Application

In Count III, plaintiff names defense counsel for Mr. Dingman; Mr. Lehman, a reporter; and the Post Star, a newspaper. It is well settled that defense counsel, even public defenders do not act under color of state law for purposes of section 1983. *Polk County v. Dodson*, 454 U.S. 312, 325 (1981). Plaintiff claims only that these inaccurate statements were made to garner more favor for Mr. Dingman.[14] Thus, without more, plaintiff cannot maintain any action against defendant Morris under section 1983, and this is an additional basis for dismissal of the action against this defendant.

Plaintiff alleges that defendant Lehman is a reporter for the Post Star. He is a private individual, who wrote an article for his newspaper. Plaintiff alleges only that defendant Lehman received the allegedly false information and published it in an article. The writing of an article by a journalist for publication does not constitute state action. *Idema v. Wager*, 120 F. Supp. 2d 361, 371 (S.D.N.Y. 2000) (citing *Rielly v. Barkley*, No. 91-CV-4871, 1992 WL 390282 (E.D.N.Y. Dec. 15, 1992); *Skinner v. Dwyer*, No. 91-CV-238, 1992 WL 265995, at *2 (N.D.N.Y. Sept. 9, 1992), *approving Rep't Recommendation* dated May 15, 1992; *Fitzpatrick v. Wert*, 432 F. Supp. 601,

---

[14] It is unclear how plaintiff is aware of exactly what Attorney Morris said. Plaintiff states that neither he nor his attorney were aware that these statements had been made until plaintiff's mother read the Lehman article in the Post Star in the morning.

603 (W.D.N.Y. 1977)). A newspaper is generally not considered a state actor for purposes of section 1983. *Nowacki v. Town of New Canaan*, No. 3:12-CV-1296, 2013 WL 785355, at *10 (D. Conn. Mar. 1, 2013) (citation omitted); *Phelan v. Sullivan*, No. 5:10-CV-724, 2010 WL 2948217, at *6 (N.D.N.Y. July 7, 2010), *adopted*, 2010 WL 2948188 (N.D.N.Y. July 22, 2010). There is also no claim of conspiracy with a state actor in this regard. Any conclusory implication to the contrary is insufficient to sustain a section 1983 claim. *See Ciambriello v. County of Nassau, supra.*

Thus, the complaint may be dismissed as against defendants Morris, Lehman, and the Post Star for lack of state action.

## VI.    **Conditions of Confinement**

### A.    **Legal Standards**

Plaintiff in this case complains about the treatment he received at the WCCF, after he was extradited from Florida and was awaiting trial on the charges relating to the assault on Renway. Allegations of mistreatment of pretrial detainees in state custody are brought under the Due Process Clause of the Fourteenth Amendment. *See Caiozzo v. Korman*, 581 F.3d 63, 69 (2d Cir. 2009). It has been held that because a pretrial detainee has not been "convicted," the proper inquiry is whether the conditions of confinement amount to punishment under the Due Process Clause, not whether the "punishment" is cruel and unusual under the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) (contrasting sentenced prisoners with pretrial detainees).

Sentenced prisoners are protected by the Eighth Amendment prohibition against

18

cruel and unusual punishment.  However, the same standard applies to conditions of

confinement claims, regardless of whether they are brought under the Eighth

Amendment, relating to convicted prisoners, or under the Fourteenth Amendment for

pretrial detainees.[15]  *See Caiozzo v. Korman*, 581 F.3d at 72.  There is an objective

element and a subjective element to this standard. *Williams v. Carbello*, 666 F. Supp.

2d 373, 378 (S.D.N.Y. 2009) (citing *inter alia Farmer v. Brennan*, 511 U.S. 825, 834

(1994) (articulating the two-part test); *Wilson v. Seiter*, 501 U.S. 294, 298 (1991);

*Phelps v. Capnolas*, 308 F.3d 180, 185 (2d Cir. 2002)); *Marcus v. Bush*, No. 11-CV-

4049, 2013 WL 2154786, at *4 (E.D.N.Y. May 17, 2013).

To satisfy the objective element, the violation regarding conditions must be

"sufficiently serious" and constitute an unquestioned and serious deprivation of basic

human needs or a denial of the minimal civilized measure of life's necessities. *Wilson,*

*supra*.  Basic human needs include food, clothing, shelter, medical care, and

reasonable safety. *Phelps, supra*.  The subjective prong requires that the defendants

knew of and disregarded an excessive risk to inmate health or safety. *Id.* at 185-86.

The defendants must both be aware of the facts from which an inference could be

drawn that a substantial risk of harm exists, and they must also draw that inference. *Id.*

### B.    Application

Plaintiff states that when he was incarcerated at the WCCF for 167 days, he was

subjected to "cruel and unusual punishment" because he was restricted to "limited

---

[15] Because the due process rights of pretrial detainees are "at least as great as the Eighth
Amendment protections available to a convicted prisoner," and the same standard applies, cases cited
that refer to the Eighth Amendment are thus applicable to the conditions of confinement claims of a
pretrial detainee. *Revere v. Mass Gen. Hosp.*, 463 U.S. 239, 244 (1983).

showers, limited telephone calls, [a] lack of communication with the other population at the jail, [and] no access to television and newspapers." (Count II ¶ 3).  Plaintiff also claims that when he left his cell for bible study classes, lawyer visits, and family visits, he was taken in handcuffs to his "awaiting visitors." (*Id.*)

As plaintiff has stated these facts, none of them rise to the level of a denial of basic human needs.  He does not claim he was denied showers, only "limited" in his showers or telephone calls.  He does state that he was not afforded communication with other inmates and was denied television and newspapers, but then states that he was able to attend "Bible Study classes" and was afforded both lawyer and family visits.

Deprivation of showers only rises to the level of a constitutional violation when the denial deprives the plaintiff of his "basis human needs." *Dillon v. City of New York*, No. 12 Civ. 7112, 2013 WL 3776167, at *2 (S.D.N.Y. July 18, 2013) (citing *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003)).  Courts are reluctant to consider even a temporary deprivation of showers a constitutional violation. *Id.* (citing cases finding that even a two-week suspension of shower privileges was not a "sufficiently serious" deprivation).  Plaintiff's claim of "limited" showers does not rise to the level of a constitutional claim as he has stated it.

The same is true for plaintiff's allegation that his telephone calls were "limited" and that he was denied access to television and newspapers.  Denial of television, access to newspapers, or access to the general population does not amount to a denial of life's necessities, particularly when plaintiff states that he was allowed both

attorney and family visits. *See Gillard v. Rovelli*, No. 9:09-CV-431, 2010 WL 5149277, at *5 (N.D.N.Y. Aug. 30, 2010) (citation omitted) (no constitutional right to television or radio) (Rep't-Rec.), *adopted*, 2010 WL 5147258 (N.D.N.Y. Dec. 13, 2010). Segregated confinement, together with its many limitations on privileges, in itself does not rise to the level of a constitutional violation. *See Dixon v. Goord*, 224 F. Supp. 2d 739, 748-49 (S.D.N.Y. 2002) (normal SHU conditions do not rise to the level of a constitutional violation); *Graham v. Perez*, 121 F. Supp. 2d 317, 323 n.10 (S.D.N.Y. 2000) (listing restrictive conditions in SHU that do not rise to the level of a constitutional violation, including limiting access to newspapers and telephone calls).

Finally, the fact that plaintiff was taken from his cell to his various visits in handcuffs and shackles does not rise to the level of a due process violation.[16] *See Bowens v. Smith*, No. 9:11-CV-784, at *10 (N.D.N.Y. Dec. 12, 2012) (placement of restraints on an inmate does not by itself amount to excessive force or cruel and unusual punishment) (citing *inter alia Bridgeforth v. County of Rensselaer*, No. 1:08-CV-779, 2012 WL 2873361, at *6 (N.D.N.Y. July 12, 2012)), (Rep't-Rec.), *adopted*, 2013 WL 103596 (N.D.N.Y. Jan. 8, 2013).

Thus, plaintiff's claims of unconstitutional conditions of confinement may be dismissed as against all Washington County defendants.

---

[16] Plaintiff does not state that he was forced to remain in handcuffs and shackles during his visits. In any event, the fact that he had family and lawyer visits while he was in restrictive custody shows further that his confinement did not deprive him of the minimal measure of life's necessities. The court would also point out that plaintiff had just been extradited from Florida to face serious criminal charges relating to the Renway assault.

## VII.  **Procedural Due Process**

### A.    **Legal Standards**

In order to begin a due process analysis, the court determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001); *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996).  In *Sandin v. Conner*, the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).

The Second Circuit has explicitly avoided a bright line rule that a certain period of  confinement in a segregated housing unit ("SHU") automatically gives rise to due process protection.  *See Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000); *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000).  Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed.  *Palmer v. Richards*, 364 F.3d 60, 64-66 (2d Cir. 2004).  A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*."  *Colon v. Howard*, 215 F.3d at 231 (finding that a

prisoner's liberty interest was infringed by 305-day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

"SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards*, 364 F.3d at 65 (citations omitted). In the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short–*e.g.*, 30 days–and there was no indication that the plaintiff endured unusual SHU conditions. *Id*. at 65-66 (collecting cases). *See also Arce v. Walker*, 139 F.3d 329, 334-35 (2d Cir. 1998) (the *Sandin* analysis is properly applied to determine whether non-punitive, administrative segregation implicates a state-created liberty interest).

## B.     Application

Plaintiff alleges that when he was placed in WCCF, he was in a "disciplinary keeplock/segregation unit" for 167 days, without being charged with a disciplinary infraction, and without any type of hearing whatsoever. (Count II ¶ 2). Plaintiff then alleges that under New York State law, an inmate detained "under these circumstances" shall have a hearing every two weeks to review his status. (*Id.* ¶ 4). In this paragraph, plaintiff appears to be describing administrative segregation and not disciplinary confinement.

Although the initial temporary segregation of an inmate in a county jail during classification procedures is valid and not an infringement on due process rights,[17] it has been held that a period of 132 days in involuntary protective custody ("IPC"), a form of administrative, rather than disciplinary segregation, is sufficient to satisfy the *Sandin* test for establishing a liberty interest. *Tavares v. Amato*, 2013 WL 3102031, at *12-13 (N.D.N.Y. June 18, 2013). In *Tavares*, the court cited a Montgomery County Jail policy stating that inmates assigned to IPC would be confined for 60 days and then their status would be reviewed every 30 days until such time that no threat to the inmate exists. *Id.* at *11.

In this case, plaintiff states that he was in disciplinary keeplock for 167 days, and he states that he should have had a hearing every two weeks to review his status in segregated confinement. However, his subsequent description of the confinement to which he was subjected does not indicate that he was in disciplinary confinement. The "limitation" of privileges is not the same as denial of those privileges. It is unclear from the complaint what type of confinement he is challenging, and his description of that confinement does not rise to the level of an atypical and significant deprivation sufficient to create a liberty interest protected by due process. Thus, as written, plaintiff does not state a procedural due process claim.[18]

---

[17] *Harvey v. Harder*, No. 09-CV-15, 2012 WL 4093792, at *7 (N.D.N.Y. July 31, 2012) (Rep't Rec.), *adopted by* 2012 WL 4093760 (N.D.N.Y. Sept. 17, 2012).

[18] The court notes that, even assuming a liberty interest existed, due process procedures for administrative segregation are minimal, requiring only an informal, non-adversary review, and not a full blown hearing, let alone a hearing every two weeks. Id. at *12 (citing *Smart v. Goord*, 441 F. Supp. 2d 631, 641 (S.D.N.Y. 2006)).

Although the court will recommend dismissing plaintiff's due process claim, the court will recommend dismissing the claim without prejudice to plaintiff submitting an amended complaint, more clearly outlining his due process claims and the individuals who may have been responsible for his alleged unconstitutional confinement. As stated above, plaintiff cannot name the WCCF or the Washington County Sheriff's Department as defendants. Additionally, as stated above, plaintiff may not name the County as a defendant unless he asserts a policy or custom that caused the deprivation to occur. Plaintiff does not indicate any individual who may have been responsible for his confinement. He attempts to name former Sheriff Leclaire, but there is no indication that he was personally involved in the alleged failure to review plaintiff's status.[19] Plaintiff is advised that personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion for IFP status (Dkt. No. 2) is **GRANTED FOR PURPOSES OF FILING ONLY**, and it is

**RECOMMENDED**, that plaintiff's complaint be **DISMISSED WITH PREJUDICE** as to **COUNTS I and III**, including all defamation claims as against all defendants pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim, and it

---

[19] The regulations provide that the Chief Administrative Officer of the County Jail (the Sheriff) shall review the inmate's status in certain circumstances, but it does not appear that the Sheriff himself necessarily reviews the inmate's classification on a regular basis. *See* 9 N.Y.C.R.R. § 7013.9(a)(1)-(a)(3) (conditions requiring review by the Chief Administrative Officer).

is further

RECOMMENDED, that plaintiff's complaint be **DISMISSED WITH PREJUDICE** insofar as it seeks to name the **WCCF** or the **WASHINGTON COUNTY SHERIFF'S DEPARTMENT FOR ANY PURPOSE**, and it is

RECOMMENDED, that plaintiff's complaint be **DISMISSED WITHOUT PREJUDICE** as to **COUNT II** in all other respects, and it is

ORDERED, that the Clerk serve a copy of this Order upon Plaintiff in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has **fourteen (14) days** within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), & 6(e).

Dated: August 12, 2013

Hon. Andrew T. Baxter
U.S. Magistrate Judge