# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

SCOTT M. THORPE,

                                    Plaintiff,

       v.                                   9:13-CV-902
                                         (GTS/ATB)

CAPTAIN EUGENE McKENNA, et al.,

                                   Defendants.

SCOTT M. THORPE, Plaintiff pro se
GREGG T. JOHNSON, ESQ & APRIL J. LAWS, ESQ. for the Defendants

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this amended civil rights complaint, plaintiff alleges that defendants improperly retained plaintiff in administrative segregation ("Ad Seg") at the Washington County Jail ("WJC") for 167 days without a hearing.[1] (Dkt. No. 7). Plaintiff seeks substantial monetary relief. Presently before the court is the defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 25). Plaintiff has responded in opposition to the motion, and defendants have filed a reply. (Dkt. Nos. 32, 33). For the following reasons, this court agrees with defendants and will recommend dismissing the complaint in its entirety.

---

[1] Plaintiff originally sued thirteen additional defendants who were dismissed earlier in this action. (Dkt. Nos. 4, 6). The only surviving issue is plaintiff's due process claim relative to his placement in Ad Seg against three defendants: Captain McKenna; Lt. William Breeyear; and Sgt. Aron Bassett. (Dkt. No. 7) (Amended Complaint).

## I. Relevant Facts

In his amended complaint, plaintiff alleges that he "left New York State on April 14, 2010." (Amended Complaint ("AC") at p.1). He was subsequently arrested in Fort Lauderdale, Florida and extradited to New York State on July 28, 2010. (*Id.*) Plaintiff states that, when he was taken into custody and brought to the WCJ, he was "immediately placed in the Special Housing Unit ("SHU")." He claims that he was never notified as to the reason for his confinement and was never afforded a hearing so that he could contest this placement. (*Id.* at 2).

Plaintiff alleges that he was kept in SHU for 167 days. During this time, he claims that his showers and telephone calls were "limited," and he could not communicate with the other inmates at the jail. Plaintiff also states that he had no access to television and newspapers, and that he was handcuffed and shackled any time that he left his cell for Bible Study Classes and "lawyer and family visits." (*Id.*) Plaintiff claims that as a result of this confinement, he suffered Post-Traumatic Stress Disorder ("PTSD"); depression; and severe anxiety. (*Id.*)

Defendants have filed numerous exhibits, including excerpts from plaintiff's October 10, 2014 deposition. (Dkt. No. 25-4, Def.s' Ex. C). Each defendant has also filed an affidavit in support of their summary judgment motion. Rather than detail all the defendants' facts at the outset, I will discuss the evidence as I analyze the issues presented by defendants' motion.

## II. Summary Judgment

Summary judgment may be granted when the moving party carries its burden of

2

showing the absence of a genuine issue of material fact. Fed. R. Civ. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id*. However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006) (citing *Celotex Corp.*, 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id*.

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id*. A dispute about a

genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Additionally, while a court "'is not required to consider what the parties fail to point out,'" the court may in its discretion opt to conduct "an assiduous view of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted).

## III. <u>Exhaustion of Administrative Remedies</u>

### A. **Legal Standards**

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675. The failure to exhaust is an affirmative defense that must be raised by the defendants. *Scott v. Del Signore*, No. 02-CV-029F, 2005 U.S. Dist. LEXIS 425473 at *4 (W.D.N.Y. Feb. 18, 2005) (citing *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004); *Giano*, 380 F.3d at 677). As an affirmative defense, it is the defendant's burden to establish

that plaintiff failed to meet the exhaustion requirements. *Id.* (citing *Giano,* 380 F.3d at 675).

In *Jones v. Bock*, 549 U.S. 199, 218 (2007), the Supreme Court held that in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Id.* (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must ***complete*** the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

## B. Application

Defendants argue that plaintiff failed to exhaust his administrative remedies regarding his placement in Ad Seg. Plaintiff was incarcerated in a county facility, thus, the court must examine the grievance procedures applicable to the WCJ. Defendants assert that plaintiff should have brought a grievance pursuant to the facility grievance procedure. Plaintiff responds by stating that he was told that Ad Seg placement was a "non-grievable" matter. Defendants argue that "futility" is not an excuse for failure to exhaust. Defendants' argument is misplaced.

At his deposition, plaintiff acknowledged receiving the Rule Book in which the grievance procedure is stated. (Def.s' Ex. C at T. 106).[2] The Rule Book has been filed as Defendants' Ex. I. (Dkt. No. 25-10). The procedure for filing grievances is found at

---

[2] The defendants have filed only excerpts of plaintiff's deposition. However, for clarity the court will cite to the transcript page of the actual deposition, which is found at the top-right hand corner of the page, rather than the page assigned by the court's electronic filing system.

pages 15-16 of the Rule Book.[3]  The Rule Book makes it quite clear that Ad Seg

placement is "not grievable and [the grievance] may be returned to the inmate by the

grievance coordinator.  Such grievances may not be appealed to the chief administrative

officer or the Citizens' Policy and Complaint Review Council." (*Id.* at 16).  Defendants

argue that plaintiff should have filed a grievance even though it would have been

"futile."[4] (Def.s' Mem. of Law at 10-11).

In support of their argument, defendants cite *Yeldon v. Ekpe*, 159 F. App'x 314,

316 (2d Cir. 2004).  In *Yeldon*, plaintiff wished to attend a funeral and claimed that he

filed a grievance, but there was no record of a grievance or an appeal.  Plaintiff was

also told that an appeal would have been "futile." *Id.* at 316.  The Second Circuit stated

that "this allegation of futility does not satisfy the exhaustion requirement because it

does not render the grievance system 'unavailable' to Yeldon." *Id.* (citation omitted).

*See Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004).  *See also Bennett v. James*,

737 F. Supp. 2d 219, 227 (S.D.N.Y. 2010) ("futility" and "unavailability" are different

concepts - a plaintiff's "perception" that filing a grievance would be "futile" is not

sufficient to render the administrative remedies "unavailable").

In *Abney*, the court held that to be "available" under the PLRA, "a remedy must

afford the 'possibility of some relief for the action complained of.'" *Id.*  Courts have

held that an inmate must exhaust his administrative remedies even if the form of relief

---

[3] Again, this court is citing to the actual page of the Rule Book which is found at the bottom-right hand corner of the page, rather than the CM/ECF-assigned page.

[4] Grievance procedures for county jails are also contained in the New York Code of Rules and Regulations ("NYCRR"), 9 N.Y.C.R.R. §§ 7034.4.

he requests (such as damages) is not available through the grievance system. *Id.* (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)).  However, if a complaint is not "grievable" at all, then the administrative remedy is not "available" because plaintiff is barred from using the grievance process to address the issue. *See Hubbs v. Suffolk County Sheriff's Dep't*, No. 14-2472, 2015 WL 3461791, at *3-6 (2d Cir. June 2, 2015) (discussing whether a matter that may not have been "grievable" according to the rule book made administrative remedies "unavailable" to the plaintiff); *Houston v. Schriro*, No. 11 Civ. 7374, 2014 WL 6694468, at *6 (S.D.N.Y. Nov. 24, 2014) (finding that the modifier "some" relief requires the possibility of some relief for the action complained of, and finding that a matter is non-grievable renders the process unavailable).  Thus, plaintiff's failure to use the grievance procedure does not render his claim unexhausted.

However, even though the grievance procedure was not "available" to plaintiff to challenge his administrative segregation, there is another section of the Rule Book that appears to provide an administrative procedure by which an inmate may challenge his "classification," although defendants did not argue that plaintiff should have utilized that procedure. (Def.s' Ex. I at 14).  This "classification" procedure involves submitting a request to the classification officer.  The section states that if an inmate wishes to "appeal" his classification, he must "put in a request to a Sergeant to review [the classification] with a classification officer." *Id.*  Because defendants did not argue that this was an appropriate method for plaintiff to use,[5] they have not met their burden to

---

[5] Plaintiff clearly did not challenge his Ad Seg status under any rule or regulation.  The issue was simply whether there was an "available" mechanism to challenge his confinement.  Defendants concede that there was no hearing that could have been appealed.

7

show that plaintiff failed to exhaust his available administrative remedies.

In any event, this court finds that plaintiff's complaint may be dismissed on the merits and will proceed to a consideration of his substantive issues.

## IV. Personal Involvement

### A. Legal Standards

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). A plaintiff "must show some tangible connection between the constitutional violation alleged and [a] particular defendant." *Toole v. Connell*, 9:04-CV-724 (LEK/DEP), 2008 WL 4186334, at *6 (N.D.N.Y. Sept. 10, 2008). In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon*

*v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995)), *rev'd on other grounds*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft*. *See Reynolds v. Murphy*, No. 3:13-CV-316, 2015 WL 1456880, at *2 (D. Conn. Mar. 30, 2015) (discussing continued viability of *Colon*) (citing *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Ashcroft* may have heightened the requirements for showing a supervisor's personal involvement)); *Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012) (discussing cases). The court in *Reynolds* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon*. 2015 WL 1456880, at *2 The court in *Conklin* pointed out that it remains true that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor. 859 F. Supp. 2d at 439 (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011)). This court finds that even if the *Colon* factors are considered, and are all still viable, plaintiff has not alleged the requisite personal involvement of defendants Breeyear and Bassett.

## B.    Application

Plaintiff's original complaint did not name any individual defendants in connection with his due process claim. (Complaint ("Compl.") Count II, ¶¶ 1-4). Although the amended complaint does name three individual defendants – McKenna, Breeyear, and Bassett – it does not indicate how any of the defendants were personally

involved in plaintiff's Ad Seg placement or his continued confinement in Ad Seg.[6] (AC ¶¶ 2-4). This court need not reach the issue of "supervisory" liability because Defendant McKenna states in his affidavit that he was the individual who ordered the plaintiff's placement in Ad Seg for the reasons that he outlines in the affidavit. Captain McKenna is the chief administrator of the facility, and he supervises both of the other defendants. In his affidavit, he has admitted personal responsibility for the Ad Seg placement. Based on defendant McKenna's statement and upon the affidavits of defendants Breeyear and Bassett, no reasonable fact finder could conclude that defendants Breeyear and Bassett were responsible for plaintiff's classification.

In his affidavit, defendant Bassett states that he was a Lieutenant at the WCJ during the time in question. (Bassett Aff. ¶ 2) (Dkt. No. 25-13). Defendant Bassett states that he is responsible for review of the Ad Seg orders "in the absence of WCJ Administrator, Capt. McKenna," and he is also responsible for insuring that "the proper procedures are implemented and followed by all WCJ correction employees and inmates." (*Id.* ¶ 4). Because Captain McKenna has already affirmed that it was his decision to place plaintiff in Ad Seg, and it is his signature on the Ad Seg order, it is clear that defendant Bassett did not make the original decision, nor did he review the order. (*See* Def.s' Ex. D ) (Ad Seg Order).

---

[6] The amended complaint states that defendants McKenna, Breeyear, and Bassett "while employed at the [WCJ] did in fact, fail to supervise and maintain the [WCJ] in reasonable safe conditions for the [plaintiff] while he was legally incarcerated there. . . . The [plaintiff] was also deprived of the Due Process of Law, with the [defendants] total lack of respect and disregard for New York State Law as well as [plaintiff's] Constitutional Rights." (AC ¶¶ 2-4). This paragraph is identical for each of the three defendants.

Defendant Breeyear was also a Lieutenant at the time of the incident in question. (Breeyear Aff. ¶ 2) (Dkt. No. 25-14). Defendant Breeyear, like defendant Bassett, is responsible for the review of Ad Seg orders "in the absence of WCJ Administrator, Capt. McKenna," and he is also responsible for insuring that "the proper procedures are implemented and followed by all WCJ correction employees and inmates." (*Id.* ¶ 4). As stated above, because defendant McKenna has affirmed that he was responsible for the Ad Seg order, defendant Breeyear was not personally involved in the decision to place plaintiff in Ad Seg or continue his confinement in Ad Seg.

At plaintiff's deposition, he testified that when he spoke to defendants Breeyear and Bassett, both of them told plaintiff that his classification and placement into Ad Seg was "the Captain's call."[7] (Pl.'s Dep. at 97). Thus, neither the amended complaint, nor any of the evidence in the record shows that defendants Breeyear and Bassett were personally involved in plaintiff's Ad Seg placement or his continued confinement in Ad Seg. The complaint may be dismissed as against defendants Breeyear and Bassett for lack of personal involvement. However, even if these defendants had been involved in plaintiff's Ad Seg confinement, plaintiff has failed to show a due process violation.

## V.  **Due Process**

### A.    **Legal Standards**

In order to begin a due process analysis, the court determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and if so, determines whether the defendants deprived plaintiff of that

---

[7] Plaintiff was referring to Captain McKenna.

liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001); *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996). The Supreme Court has held with respect to convicted prisoners, that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).

Pretrial detainees may not be subjected to "punishment" prior to an adjudication of guilt, and the Second Circuit has determined that the *Sandin* analysis does not apply to a pretrial detainee. *Johnson v. Maha*, 460 F. App'x 11, 14 (2d Cir. 2012) (citing *Benjamin v. Frasier*, 264 F.3d 175, 188 (2d Cir. 2001)). A pretrial detainee need not meet the stringent "atypical and significant" standard because the detainee's interest in freedom from unjustified infliction of pain and injury is more substantial. *Benjamin*, 264 F.3d at 188-90. *See also Iqbal v. Hasty*, 490 F.3d 143, 146 (2d Cir. 2007), *rev'd on other grounds Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (the Second Circuit holds that *Sandin* does not apply to pretrial detainees); *Best v. New York City Dep't of Correction*, 14 F. Supp. 2d 341, 347 (S.D.N.Y. 2014) (same).

Therefore, in the case of a pretrial detainee, the court must determine whether the condition imposed on the inmate was for a legitimate purpose or for the purpose of punishment. *LaRock v. Amato*, No. 9:12-CV-503, 2013 WL 5466410, at *12 (N.D.N.Y. Sept. 30, 2013) (quoting *Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979)). This

determination will turn on whether an alternative purpose may be assigned to the restrictions, and whether the restrictions appear excessive in relation to the alternative purpose. *Id.* If a restriction or condition is not reasonably related to a legitimate goal, or if it is arbitrary or without purpose, then the court may infer that the condition is a "punishment" that may not be inflicted upon pretrial detainees. *Id.*

In *LaRock*, the court analyzed both the plaintiff's initial placement in involuntary protective custody ("IPC") as well as his "continued confinement" in IPC. *Id.* at *12-14. With respect to the initial confinement (pending classification), the court held that the temporary segregation of an inmate in a county jail during classification procedures was valid and did not infringe upon the inmate's due process protections. *Id.* at *13. However, with respect to LaRock's continued confinement in IPC, the court held that a pretrial detainee who was confined to IPC, was incarcerated under conditions that were more akin to disciplinary confinement than simple segregation, notwithstanding the defendants' argument that the confinement was administrative. *LaRock*, 2013 WL 5466410, at *14. The court then considered the defendants' argument that the continued confinement was justified by safety and security reasons, and found that "none" of those reasons were included in the record. *Id.* The defendants in *LaRock* had failed to proffer a penological justification for their conduct in confining the plaintiff.[8] *Id.* Thus, the court held that a liberty interest was created by the fact that LaRock spent approximately three months as a pretrial detainee in an environment generally reserved

_____

[8] In *LaRock*, defendants placed the plaintiff in IPC based solely upon his status as an inmate with either a history of sex crimes or "pending sex crimes." 2013 WL 5466410, at *14.

for those guilty of disciplinary infractions and subject to punitive confinement of twenty-three hours per day. *Id.*

Once the court determines that a liberty interest exists, then the court determines how much process is due. *See Wilkinson v. Austin*, 545 U.S. 209, 224-25 (2005) (when a liberty interest is established, the court turns to the question of what process is due an inmate because the requirements of due process are flexible depending on what the particular situation demands) (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *Mathews v. Eldridge*, 424 U.S. 319 (1976)). If the confinement is disciplinary, then the due process protections outlined in *Wolff v. McDonnell*, 418 U.S. 539 (1974) apply. These include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing, *inter alia, Wolff v. McDonnell*, 418 U.S. at 563-67). The hearing officer's findings must be supported by "some reliable evidence." *Id*. (*citing, inter alia, Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

If the restraint is for administrative purposes, the minimal procedures outlined in *Hewitt v. Helms*, 459 U.S. 460 (1983) apply. The *Hewitt* standard requires only that inmate receive some notice of the reasons for the placement and an opportunity to present his views to the prison official charged with deciding whether to transfer the inmate into Ad Seg. *Samms v. Fischer*, No. 9:0-CV-349, 2011 WL 3876528, at *10 (N.D.N.Y. March 25, 2011) (Rep.-Rec.), *adopted by* 2011 WL 3876522 (N.D.N.Y.

Aug. 31, 2011).[9]  The opportunity to present the inmate's views need not be as formal

as that required for disciplinary proceedings, rather, the officials must conduct an

informal and non-adversary review of the information in support of the inmate's

transfer into administrative custody. *Id.* (citations omitted).

## B.    Application

Defendants argue[10] that even though plaintiff was in Ad Seg for 167 days, no

liberty interest was created because plaintiff had most of the privileges afforded to

inmates who were confined in general population.  Defendants also submit a form,

signed by plaintiff, acknowledging that he was being placed in Ad Seg. (Def.s' Ex. D)

(Dkt. No. 25-5).  Plaintiff's signature appears directly below the explanation of why he

was being placed in Ad Seg.  During plaintiff's deposition, he testified that, while he

was confined to Ad Seg, he was allowed to have visits; he was allowed to use the

library the same as inmates in general population, he participated in worship; he was

given an hour of recreation per day; he had books, papers and magazines; he obtained a

radio through the commissary; he had no mail restrictions; his meals were served in the

same manner as those served in general population; and the nurses made rounds as

frequently as they did in general population. (Pl.'s Dep. at 66-85).  Even though

---

[9] The district court in *Samms* relied upon *Hewitt v. Helms*, 459 U.S. 460, 476 (1983), for this due process requirement.  The court did note that although the *Hewitt* analysis for determining the existence of a liberty interest was overruled in *Sandin* for convicted inmates, the *Hewitt* decision was still instructive in determining the appropriate level of procedural safeguards once a liberty interest is found. 2011 WL 3876528, at *10 n.4 (citing *Wilkinson v. Austin*, 545 U.S. at 229).

[10] Even though defendants relied only on *Sandin* in their analysis, many of the reasons for finding that the condition were not atypical and significant are also reasons why the confinement was not punitive.

plaintiff alleged in the amended complaint that there was a "lack of communication" with the "other population" at the jail, defendant McKenna states that SHU inmates can communicate with each other based on their cells' proximity to each other. (*See* AC at 2; McKenna Aff. ¶ 8).

The difference between Ad Seg and general population was that Ad Seg inmates were not allowed to watch television, and plaintiff was required to be handcuffed and shackled every time he was escorted out of his cell.[11] (*Id.* at 70-71. 83-84). Plaintiff also testified that although he was only supposed to be allowed to take two showers per week, often the corrections officers were nice to him and allowed him to take extra showers upon plaintiff's request. (*Id.* at 79). During his deposition, in response to all defense counsel's questions about the privileges he was allowed to have, plaintiff stated: "I'm not saying I was abused by anyone. I'm just saying that you can't go [sic] be throwing people in the box for no reason." (*Id.* at 79-80). Plaintiff also testified that his telephone use was more limited that the inmates in general population, but sometimes the guards allowed him to have more telephone calls than he would have been allowed according to the rules for Ad Seg. (*Id*. at 75-76). Thus, although separated from inmates in general population, plaintiff essentially enjoyed most of the same privileges.

The facts relevant to the due process analysis for pretrial detainees as stated above is the defendants' justification for their restrictions on plaintiff. Defendant

---

[11] Given plaintiff's fugitive status, the defendants' use of restraints when escorting plaintiff around the facility was reasonable and related to a legitimate penological interest.

McKenna's affidavit states that plaintiff entered WCJ on July 28, 2010 and was

released from WCJ on March 22, 2011. (McKenna Aff. ¶ 5) (Dkt. No. 25-12). Plaintiff

was charged with Second Degree Kidnaping and Attempted Second Degree Murder.

(*Id.*) Plaintiff conspired with two other individuals to kidnap the victim at gunpoint and

murder him by, inter alia, forcing him to consume alcohol and drugs in an attempt to

make the planned death appear to be suicide. (*Id.*) Plaintiff's associates were arrested

after the incident, but plaintiff fled to Florida and was later extradited and returned to

New York State and the WCJ. (*Id.*)

According to defendant McKenna, plaintiff's associates assisted law enforcement

by providing the information and evidence used to arrest and prosecute plaintiff. (*Id.*)

On the day that plaintiff was brought to WCJ, both his criminal associates were already

housed there. (*Id.*) Defendant McKenna states that upon plaintiff's arrest, WCJ was

provided with a "Uniform Sentence and Commitment" form, which indicated that

plaintiff was to be "confined without bail," and that an "order of protection" had been

issued. (McKenna Aff. ¶ 6 & Def.s' Ex. J) (Dkt. Nos. 25-11, 25-12). Defendant

McKenna states that WCJ was informed by the Washington County District Attorney's

Office that plaintiff's "associates" would be testifying against him and cautioned

against plaintiff "having access to those criminal associates in the general population of

the WCJ." (McKenna Aff. ¶ 6). Defendants Breeyear and Bassett also state in their

affidavits that "WCJ was instructed by the Washington County District Attorney's

Office to separate Inmate Thorpe from his former associates." (Bassett Aff. ¶ 5;

Breeyear Aff. ¶ 5).

Defendant McKenna states that due to the fact that plaintiff and both of his

associates were housed at WCJ, *he issued* an Ad Seg Order on July 28, 2010. (*Id. &*

Def.s' Ex. D).  Defendants Breeyear and Bassett also state that under the totality of the

circumstances, plaintiff's presence in the general population posed a threat to the lives

of his former associates and to the security of the facility.  All defendants point out that

plaintiff "remained in segregation after he attempted to solicit inmates on kitchen detail

to poison one of his former associates before he had an opportunity to testify against

him at trial." (McKenna Aff. ¶ 9; Bassett Aff. ¶ 6; Breeyear Aff. ¶ 6).

Based upon the facts above, it is clear that plaintiff's placement in Ad Seg was

reasonable and fulfilled the legitimate objective of keeping him separated from two

individuals who were going to testify against him.  Defendants are correct in stating

that the safety and security of the facility required this placement.  The best evidence

that plaintiff's placement was not punitive is the fact that he was transferred into

general population immediately after his criminal associates were transferred out of

WCJ. (McKenna Aff. ¶ 15).  At that point, plaintiff "posed no specific danger to the

safety and welfare of others in the facility, [and] he was transferred out of the SHU and

into the general population." (*Id.*)

Defendant McKenna also states that, after his transfer into general population,

plaintiff remained there until he was placed on suicide watch on January 27, 2011, after

his conviction for "numerous violent crimes," and "it became apparent that he would be

incarcerated for a significant amount of time." (*Id.*)  He was placed on suicide watch

again in March of 2011, after he was sentenced. (*Id.*)  Each time he was placed on

suicide watch, he had been evaluated by mental health professionals as a "safety precaution" due to his "high risk for suicide attempt." (*Id.*) Thus, none of plaintiff's confinements at the WCJ were "punitive," they were reasonably related to legitimate safety and security concerns, and the only alternative because plaintiff's two "associates" were housed in the general population of the same facility when he arrived there. Thus, no liberty interest arose because no rational finder of fact could conclude that plaintiff was subjected to "punishment."

However, even if plaintiff had a liberty interest, plaintiff received all the process that he was due. Clearly, the confinement to which he was subjected was "administrative." Thus, he was not entitled to a full-blown *Wolff* hearing. *Hewitt, supra.* Plaintiff was only entitled to notice and "an opportunity" to be heard regarding his placement. Plaintiff received "notice" in the form of the Ad Seg order that he signed. (Def.s' Ex. D). In his response to defendants' summary judgment motion, plaintiff states that he did not sign this form and asks the court to compare the signature on that form with his signature on the receipt of "Facility Issued Items," signed on the same day. (Dkt. No. 32 at CM/ECF pp. 6, 7).

Although plaintiff claims that the signatures "look nothing alike," they actually look very much alike. Thus, plaintiff had "notice" of the reason that he was being placed in Ad Seg. Plaintiff also admits that he received a copy of the Rule Book, and although he was correct that Ad Seg is not a "grievable" issue, the Rule Book does indicate that an inmate's classification may be challenged in a procedure specific to "Inmate Classification." (Def.s' Ex. I at 14). An inmate who wishes to "appeal" his

19

classification may do so by "put[ting] in a request to a Sergeant to review with a classification officer. . . ." (*Id.*) Plaintiff had his "opportunity" to be heard on the matter of his classification. This is all that is required for administrative confinement under *Hewitt*. Contrary to plaintiff's argument, a full *Wolff* hearing was not required. Thus, plaintiff's due process claim may be dismissed as against all defendants.[12]

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 25) be **GRANTED**, and the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated: June 3, 2015

Hon. Andrew T. Baxter
U.S. Magistrate Judge

---

[12] Because this court finds that no constitutional violation occurred, the court need not address defendants assertion of qualified immunity.